**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Lishui Mpin Toys Co., Ltd., | § | |
| | § | CASE No: 1:26-cv-945 |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| Sentk LLC, | § | |
| J & Y Stucco LLC, Heyblack International | § | |
| Trade Inc., Shenzhen Yongsheng | § | |
| Technology Co., Ltd., and Qin Lu. | § | |
| | § | |
| *Defendants*. | § | |

## <u>DEFENDANTS' EMERGENCY MOTION TO DISSOLVE, OR ALTERNATIVELY MODIFY, THE PRELIMINARY INJUNCTION ORDER</u>

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................. 1

II.   LEGAL STANDARD .......................................................................................... 3

III.   ARGUMENT ....................................................................................................... 4

   A.   **The PI Order Should Be Dissolved Due to Fatal Procedural Defects.** ......................... 4

      1.   **PI Order Should Be Dissolved because the *ex parte* TRO did not comply with Rule 65(b)(1)(B).** ........................................................................................ 4

      2.   **The PI should be Dissolved because the Defendants did not receive the fair, timely notice required by Rule 65(a)(1).** ................................................... 5

      3.   **A Preliminary Injunction Does Not Automatically Follow a TRO.** ......................... 8

   B.   **Plaintiff Failed to Demonstrate Irreparable Harm.** .............................................. 9

      1.   **Plaintiff's delay in seeking injunction relief warrants the dissolution of the PI Order.** ................................................................................................. 9

      2.   **Plaintiff's conclusory assertion cannot show irreparable harm.** ......................... 11

   C.   **Plaintiff Has Not Shown a Likelihood of Success on the Merits.** .............................. 13

      1.   **Plaintiff's U.S. registrations are not entitled to a statutory presumption of validity.** ................................................................................................. 13

      2.   **Plaintiff failed to show the Chinese Copyrights are valid.** ............................... 14

      3.   **Plaintiff's own authorship theory is facially inconsistent with its registration records, which at minimum destroys any reliable showing of ownership and may implicate § 411(b).** ...................................................................... 16

      4.   **Plaintiff also fails to establish likely infringement.** ..................................... 18

   D.   **The balance of hardships weighs in Defendants' favor.** ........................................ 19

   E.   **The PI Order is grossly overbroad and must at least be modified.** ............................ 20

      1.   **The PI Order granted Count II related relief that Plaintiff never actually argued in its motions.** ..................................................................................... 21

      2.   **PI Order effectively authorizes TikTok to shut down entire stores, which has no adequate basis in the record.** ........................................................... 22

      3.   **The PI Order also sweeps too broadly in the conduct it prohibits.** ....................... 23

      4.   **The PI Order's financial restraints are independently defective.** ........................ 23

IV.   CONCLUSION .................................................................................................. 25

Defendants Sentk LLC, J & Y Stucco LLC, Heyblack International Trade Inc. (together with Sentk LLC and J & Y Stucco LLC as the "Store Defendants"), Shenzhen Yongsheng Technology Co., Ltd ("Yongsheng")., and Qin Lu (collectively with Store Defendants and Yongsheng as "Defendants"), by and through undersigned counsel, move on an emergency basis to dissolve the Preliminary Injunction Order entered on February 17, 2026 (Dkt. 30) (the "PI Order"), or, at minimum, to modify it substantially.

## I.    INTRODUCTION

This is not a typical anonymous Schedule A case involving unknown online sellers who could be reached only through a storefront email address. Plaintiff itself alleges that Defendants were "centrally managed and controlled" by or closely associated with one of Plaintiff's former clients. Plaintiff nevertheless asked the Court to treat this case as if Defendants were effectively unreachable, representing that there was "no verified address for service of process" for Shenzhen Yongsheng and Qin Lu, and that email was the method "most likely to reach" Defendants. Those positions cannot be reconciled. That problem is even more serious because, as set forth in the Lu Declaration, Plaintiff and its owner Yan He had a preexisting relationship with Qin Lu. *See* Lu Decl., ¶¶4-6. In short, Plaintiff obtained *ex parte* relief by portraying this matter as an anonymous online-enforcement case when, in reality, Plaintiff already claimed to know who stood behind the accused stores. Thus, Plaintiff's *ex parte* presentation that Defendants could only be reached through an unverified storefront email was materially incomplete at best and misleading at worst.

The TRO-to-PI process that followed was riddled with procedural defects. The *ex parte* TRO did not comply with Rule 65(b)(1)(B)'s strict requirements, and the later PI was never preceded by the kind of fair, meaningful notice Rule 65(a)(1) requires. Defendants did not actually receive notice of this litigation or review Plaintiff's PI materials before the restraints took effect and first

learned of this case only after TikTok froze the store on or about February 25, 2026. *See* Zhang Decl., ¶¶7-11. By then, TikTok had already frozen the account, removed non-accused products, and later closed the store entirely. A defendant who first learns of the action only after its store has been frozen has not received the "fair opportunity to oppose" that Rule 65(a)(1) and due process demand.

Plaintiff also failed to make the substantive showing necessary to justify extraordinary preliminary relief. Plaintiff waited more than six months after the alleged notice before filing suit, even though it now claims urgent irreparable harm. On the merits, Plaintiff's ownership showing is deeply flawed: its Complaint says the Copyrighted Works were created by Yan He and Jiuzhou Liu together, yet its U.S. registrations largely identify Yan He alone while its Chinese registrations identify Liu Jiuzhou alone. Plaintiff's Chinese registration materials also lack certified translations and proper authentication. Plaintiff likewise failed to establish likely infringement across the full range of restrained products, offering only limited comparison evidence while obtaining relief sweeping across more than forty listings.

Finally, the PI is grossly overbroad. Plaintiff did not meaningfully argue for preliminary relief on Count II, and in fact told the Court that Defendants No. 4 and No. 5—who were mainly involved in that claim—"will not be directly impacted by any TRO." Yet the PI order nevertheless restrains Defendants from using allegedly false copyright complaints on e-commerce platforms, even though Plaintiff never developed the legal or factual basis for that relief in its motion papers. The PI is also far broader than Plaintiff itself now claims to have wanted: although Plaintiff's counsel later wrote, "We never intend to delist the store, only the infringing products," the PI order directs TikTok to "disable and cease providing services for any accounts" through which Defendants sell accused products, and TikTok in fact shut down the stores. The order further

freezes all funds, including future sales, even though Plaintiff never showed that money damages would be uncollectible or that a blanket prejudgment freeze was warranted.

For all of these reasons, the Preliminary Injunction should be dissolved. At minimum, it should be substantially modified so that any relief is limited to specifically identified accused listings, non-accused products and funds are released, and Defendants' ordinary store operations are restored.

## II.    LEGAL STANDARD

TROs and preliminary injunctions are extraordinary and drastic remedies that "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To obtain a preliminary injunction in the Seventh Circuit, a plaintiff must demonstrate: "(1) it is likely to succeed on the merits, (2) it has no adequate remedy at law, and (3) it will suffer irreparable harm in the absence of preliminary relief". *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 895 (7th Cir. 2001) (citing *Abbott Labs. v. Mead Johnson & Co*., 971 F.2d 6, 11-12 (7th Cir. 1992)). If these elements are shown, the court then employs a "sliding scale" approach, balancing the harms to the parties and considering the public interest. *Id*. Although the Court has already granted a preliminary injunction, it did so on an *ex parte* basis under circumstances that closely resembled a TRO, and without the benefit of adversarial briefing. Thus, plaintiff bears the burden of persuading the Court that it should not disturb the injunction. *See Jiaxing Zichi Trade Co. v. Yang*, No. 21 C 973, 2021 WL 4498654, at *3 n. 3 (N.D. Ill. Aug. 19, 2021).

### III. ARGUMENT

**A. The PI Order Should Be Dissolved Due to Fatal Procedural Defects.**

**1. PI Order Should Be Dissolved because the *ex parte* TRO did not comply with Rule 65(b)(1)(B).**

Rule 65 sharply limits the circumstances in which a court may issue a temporary restraining order without notice. Under Rule 65(b)(1)(B), before an ex parte TRO may issue, "the movant's attorney" must certify in writing **both** "any efforts made to give notice" **and** "the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(B). The Supreme Court has emphasized that *ex parte* TROs are subject to Rule 65(b)'s "stringent restrictions," and that those restrictions exist precisely because *ex parte* relief is an extraordinary departure from the usual adversarial process. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 438–39 (1974).

The Seventh Circuit likewise treats compliance with Rule 65(b)'s procedural safeguards as mandatory, not optional. In *American Can Co. v. Mansukhani*, the court held that by entering an *ex parte* TRO that failed to comply with the "strict procedural requirements" of Rule 65(b), the district court abused its discretion. 742 F.2d 314, 321–24 (7th Cir. 1984). Other courts have done the same where counsel failed to file the certification required by Rule 65(b)(1)(B). See, e.g., *Woodard-CM, LLC v. Sunlord Leisure Prods., Inc.*, No. 20-23104-CIV, 2020 WL 5547917, at *1 (S.D. Fla. July 29, 2020) (denying TRO because plaintiff's attorney had not certified in writing any efforts made to give notice and the reasons notice should not be required).

That is exactly what happened here. Plaintiff's original ex parte TRO papers did not include the certification Rule 65(b)(1)(B) required. Plaintiff later admitted as much. In its March 7 filing, Plaintiff expressly stated that the Rule 65(b)(1)(B) declaration had been "inadvertently omitted from the filing" and was being submitted nunc pro tunc to correct that omission. Dkt. 36; Dkt. 36-

1 at 1. That concession resolves the point: the required certification was **not before the Court** when *ex parte* relief was sought and granted.

The later filing does not cure the defect. Rule 65(b)'s safeguards are designed to constrain *ex parte* relief **before** it is entered, not retroactively after the restrained parties appear. *Granny Goose*, 415 U.S. at 438–39; *American Can*, 742 F.2d at 321–24. This defect was never cured because the PI itself was also entered in the absence of adversarial presentation. In these circumstances, the TRO's procedural invalidity infected the path to the PI, and the Court should dissolve the PI rather than permit an improperly obtained ex parte order to harden into continuing injunctive relief.

### 2. The PI should be Dissolved because the Defendants did not receive the fair, timely notice required by Rule 65(a)(1).

A preliminary injunction may issue only "on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). The Supreme Court has explained that this means notice sufficient to give the defendant "a fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 433 n.7 (1974). Due process likewise requires notice "reasonably calculated, under all the circumstances," to apprise interested parties of the action and afford them an opportunity to respond. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Rule 65(a)(1), therefore, is not satisfied merely because a plaintiff can show that a document was sent somewhere. The question is whether the notice method used was reasonably calculated to give the defendant a real, timely, and meaningful opportunity to oppose the requested injunction.

That did not happen here. Plaintiff obtained alternative electronic service by portraying this case as though it were a typical anonymous Schedule A matter involving unknown online sellers who could be reached only through a storefront email address. In seeking that relief, Plaintiff told

the Court that the storefronts did not disclose physical addresses or registration information, that the stores listed business@winktoys.com as the "official communication method," and that email therefore was the method "most likely to reach" Defendants. Plaintiff went further and represented that, although a manufacturing address for Shenzhen Yongsheng appeared on product packaging, "there is no verified address for service of process," and that there was likewise "no verifiable physical address" for Qin Lu. Dkt. 19 at 4.

But Plaintiff's own pleadings undermine that narrative. In the Complaint, Plaintiff alleges that Defendants were "centrally managed and controlled by or closely associated with" Ningbo East Future Imp & Exp Co., Ltd. ("East Future"), which Plaintiff identifies as one of its former clients, and to whom Plaintiff had supplied genuine Mpin products beginning in July 2024. Dkt. 1 ¶¶ 34–35. If Plaintiff's own theory is that these Defendants were managed and controlled through East Future, and if Plaintiff had a supply relationship with that management chain, then Plaintiff cannot simultaneously claim that Defendants were effectively unreachable and that only an unverified storefront email justified *ex parte* relief and emergency electronic service. Those positions are not merely in tension; they are materially inconsistent.

The inconsistency is even more serious because Defendants' evidence shows that Plaintiff and its owner Yan He in fact had a preexisting relationship with Defendant Qin Lu. *See* Lu Decl.¶5. Qin Lu had prior dealings with Plaintiff, had direct communications and a social-media connection with Yan He, and transferred funds to Yan He on multiple occasions. *Id*, at ¶6. This, then, was not a situation in which Plaintiff genuinely lacked practical means to identify or reach the relevant people. Yet Plaintiff presented the matter to the Court as though Defendants were anonymous, unknown internet actors contactable only through a single storefront email. That omission matters.

It deprived the Court of the full factual picture when Plaintiff sought extraordinary *ex parte* relief and special service accommodations.

Nor was the email address Plaintiff selected one reasonably calculated to provide actual, timely notice to the relevant Defendants. As Zhang's declaration explains, business@winktoys.com was not the email address registered to Store Defendants' TikTok accounts and were not regularly monitored by Store Defendants for business communications or legal matters. *See* Zhang Decl. ¶8. Store Defendants did not actually notice any email regarding this litigation before the restraints took effect and that it first learned of the lawsuit only after TikTok froze the account on or about February 26, 2026. *Id*, at ¶9. Under *Mullane*, notice is not "reasonably calculated" when the plaintiff chooses a method that is not the defendant's actual legal-notice channel, particularly where the plaintiff had reason to know that better avenues of contact existed.

That failure is not cured by the fact that Plaintiff may have technically transmitted the PI motion. Rule 65(a)(1) requires a fair opportunity to oppose, not a purely formal act of transmission. *Granny Goose*, 415 U.S. at 433 n.7. Here, Defendants had no such opportunity. By the time the Store Defendants actually became aware of the case, TikTok had already frozen the store, removed non-accused products, and later shut the store down entirely. *See* Zhang Decl. ¶¶11-12. A defendant who first learns of a case only after its store has already been frozen and its lawful products removed has not received the kind of notice Rule 65 contemplates.

The prejudice from this defective notice was not technical or harmless. Plaintiff first obtained a TRO "in the absence of adversarial presentation," then used that TRO to trigger sweeping platform-level and financial restraints, and only after those restraints were in place did Defendants gain a meaningful chance to appear. Under these circumstances, the Court should not

treat Plaintiff's one-sided service narrative as sufficient. Plaintiff obtained alternative service and preliminary relief by miscasting this case as an anonymous online-enforcement matter while omitting facts showing that Plaintiff itself claimed to know the management chain behind Defendants and, on Defendants' evidence, had direct or indirect means of contacting the relevant people. Plaintiff then used an unverified email address that was not Defendants' actual legal-notice channel, and Defendants did not learn of the case until after their stores were frozen. That is not notice "reasonably calculated" to provide a fair opportunity to oppose. *Mullane*, 339 U.S. at 314.

Because Defendants did not receive the fair, timely notice required by Rule 65(a)(1), the Preliminary Injunction should be dissolved.

### 3. A Preliminary Injunction Does Not Automatically Follow a TRO.

Plaintiff made no attempt in its PI Motion to show that it has established the elements for a PIO other than argued that "[b]y issuing the TRO, the Court has already found that Plaintiff has met the burden on this Motion." Dkt. No. 28 at 3. Plaintiff's argument is incorrect. As this district court has observed,

> The plaintiff asserts that this Court should grant the preliminary injunction motion because it "already granted a TRO … and the standard for granting a TRO and the standard for granting a preliminary injunction are identical in this Circuit." The TRO was issued, however, in an expedited, ex parte proceeding and does not, of course, preclude the Court from revisiting its initial impressions based on that incomplete record in a preliminary injunction proceeding as to which the defendant has received notice and an opportunity to respond to the plaintiff's arguments. By the plaintiff's logic, there would be no need for a preliminary injunction proceeding, a position that cannot be squared with the limited shelf life of a TRO and the notice and hearing requirements for issuance of a preliminary injunction motion.

*Jun Lu v. DEVICE X and DREAMALL*, Case No. 1:23-cv-04282, ECF No. 27 at p. 1 n.1 (N.D. Ill. Sep. 14, 2023) (unpublished) (citing Fed. R. Civ. P. 65) (other internal references omitted). This is particular true because Defendants never had actual notice of Plaintiff's motions until the PI Order was entered and their TikTok accounts were restrained.

## B. Plaintiff Failed to Demonstrate Irreparable Harm.

Plaintiff's request for extraordinary injunctive relief fails for an additional and independent reason: Plaintiff never made the evidentiary showing of irreparable harm that Rule 65 requires. Under controlling Seventh Circuit law, irreparable harm is a threshold requirement for a preliminary injunction. A movant must show not only some likelihood of success on the merits, but also that it "has no adequate remedy at law" and "will suffer irreparable harm in the absence of an injunction." *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022). The Seventh Circuit has further emphasized that "a future threat of irreparable harm must exist to warrant injunctive relief." *Id.* at 621. Harm is irreparable only if legal remedies are inadequate—meaning they are "seriously deficient as compared to the harm suffered." *Id.* at 618. In copyright cases the Supreme Court "made clear that there is no ... presumption" of irreparable harm simply by showing the defendant infringed a copyrighted work. *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012).

### 1. Plaintiff's delay in seeking injunction relief warrants the dissolution of the PI Order.

"[T]he likelihood of irreparable harm takes into account how urgent the need for equitable relief really is." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). "[U]nexcused delay on the part of parties seeking extraordinary injunctive relief is grounds for denial of a motion because such delay implies a lack of urgency and irreparable harm." *Ixmation, Inc. v. Switch Bulb Co., Inc.*, No. 14-cv-6993, 2014 WL 5420273, at *7 (N.D. Ill. Oct. 23, 2014) (four-and-a-half month delay precluded finding of irreparable harm); *see also Ty, Inc. v. Jones Group Inc.*, 237 F.3d 891, 903 (7th. Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a

preliminary injunction is not entered."). This delay is even more significant when the movant has "knowledge of the pending nature of the alleged irreparable harm." *Id*.

That is exactly the problem here. Plaintiff alleges that it knew of Defendants' sale of the Accused Products by at least **July 2025**. Dkt. 1 ¶ 52. Yet Plaintiff did not file this action until **January 27, 2026**, more than six months later. Plaintiff offers no meaningful explanation for that delay. Where a plaintiff has knowledge of the alleged conduct and nonetheless waits months before seeking emergency relief, the delay itself strongly suggests that the harm is not truly irreparable or urgent. *Ty*, 237 F.3d at 903. That conclusion is reinforced by recent Northern District authority. In *Collectanea J. Limited v. The Partnerships and Unincorporated Associations Identified on Schedule A*, Judge Ellis dissolved a preliminary injunction because the plaintiff's delay in pursuing its claims and preliminary relief "preclude[d] a finding of irreparable harm." No. 24 C 3821, 2024 WL 4604532, at *8 (N.D. Ill. Oct. 29, 2024). The same reasoning applies here. Plaintiff waited more than six months after the alleged notice, yet now asks the Court to accept that only immediate and sweeping equitable relief could prevent irreparable injury.

The delay is even more telling because Plaintiff's alleged injuries are ordinary commercial injuries—lost sales, lost customers, and lost market share—occurring through e-commerce channels that are trackable and quantifiable. Plaintiff also alleges that it has its own resellers and "authorized resellers," which further underscores that the relevant marketplace is a commercial distribution network, not some untraceable or inherently unquantifiable injury. Dkt. 30 ¶ 1(g). If Plaintiff truly believed that Defendants' sales posed an urgent existential threat to its goodwill or exclusivity, it had every incentive to move promptly. Its failure to do so speaks volumes.

In short, Plaintiff had knowledge, waited more than six months, offered no satisfactory justification, and now seeks to characterize the same conduct as requiring emergency equitable

intervention. Under Seventh Circuit law, that unexplained delay substantially undermines—indeed, on this record defeats—any claim of irreparable harm. *Michigan*, 667 F.3d at 788; *Ty*, 237 F.3d at 903; *Collectanea*, 2024 WL 4604532, at *8.

**2. Plaintiff's conclusory assertion cannot show irreparable harm.**

The Seventh Circuit is clear that "speculative injuries do not justify" granting injunctive relief, and a moving party "cannot obtain a temporary injunction by speculating about hypothetical future injuries." *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704-06 (7th Cir. 2005). Rather, a plaintiff's "evidence must demonstrate that [it] ha[s] carried [its] burden 'that irreparable injury is likely' —not just possible —'in the absence of an injunction.'" *Mich. v. U.S. Army Corps of Eng'rs*, No. 10-CV-4457, 2010 WL 5018559, at *24 (N.D. Ill. Dec. 2, 2010).

Here, Plaintiff's TRO memorandum devotes only a few lines to irreparable harm. It says, in substance, that Plaintiff spends substantial sums on marketing, that the accused products are "exact copies," that they are similarly priced and target the same consumers, and that they therefore are "very likely to cut into Plaintiff's customer base and impact[] the brand reputation." Dkt. 7 at 16–17. Plaintiff then leaps from those assertions to the conclusion that there is "potential great harm to reputation, brand confidence, and potential lost market share." *Id.* Plaintiff's PI motion is even thinner. There, Plaintiff argued that "[b]y issuing the TRO, the Court has already found that Plaintiff has met the burden," and then added only that "[i]rreparable harm is likely to be inflicted due to the nature of infringement (direct copy and counterfeiting) and potential reduction of sales." Dkt. 28 at 3.

That is not evidence of likely irreparable harm. It is a collection of legal conclusions and generalized business platitudes. Plaintiff offered no customer declaration, no reseller declaration, no evidence of lost contracts, no evidence that any platform suspended Plaintiff because of

confusion, and no concrete proof that any reputational injury actually occurred or was likely to occur. Plaintiff simply assumes that alleged copying plus competition must equal irreparable injury. Seventh Circuit law does not permit that shortcut. *DM Trans*, 38 F.4th at 620–21; *Flava Works*, 689 F.3d at 755–56. The Ninth Circuit's decision in *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.* is especially instructive on this point: "unsupported and conclusory statements" about goodwill and reputation do not suffice to show likely irreparable harm. 736 F.3d 1239, 1250 (9th Cir. 2013).

Plaintiff's own theory of injury also confirms that the alleged harms are economic and traceable, not irreparable. Plaintiff says it spends substantial sums on marketing, that the products compete for the same customers, and that it may lose sales, customers, and market share. Dkt. 7 at 16–17. Those are classic economic harms that can be addressed through actual damages, disgorgement, or an accounting. The Seventh Circuit has held that where losses are "purely financial, easily measured, and readily compensated," there is no irreparable harm. *Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*, 255 F.3d 460, 463 (7th Cir. 2001). That principle fits this case exactly. The alleged injuries arise from e-commerce sales on traceable platforms, where listings, orders, traffic, payouts, and account data can all be identified and quantified.

Plaintiff's assertions of confusion, reputational harm, and damage to goodwill are especially weak on this record. Qin Lu's company purchased Plaintiff's products and sold them on TikTok under that company's own trademark. *See* Lu Decl. ¶6. That fact cuts directly against Plaintiff's theory that the marketplace necessarily associates these products with Plaintiff in a way that creates the kind of immediate, unquantifiable reputational harm Plaintiff now claims. If the products were being sold under different branding in the marketplace, that strongly undermines any claim that Plaintiff's goodwill or reputation was being irreparably damaged through source confusion. At

minimum, it shows that Plaintiff's sweeping assertions about confusion and reputational injury cannot simply be presumed.

Nor does Plaintiff identify any actual, imminent lost sale or lost customer relationship. Plaintiff speaks only of **potential** lost sales, **potential** loss of market share, and **potential** harm to reputation. Dkt. 7 at 16–17. But "potential" harm is not the same as imminent irreparable injury. Preliminary injunctive relief requires proof of likely and imminent injury, not generalized predictions about what might happen in the future. *Winter*, 555 U.S. at 22; *Bellon Wrecking*, 414 F.3d at 704–06.

Thus, because Plaintiff's irreparable-harm showing is speculative, conclusory, and centered on economic injuries, the PI should be dissolved for lack of irreparable harm.

## C. Plaintiff Has Not Shown a Likelihood of Success on the Merits.

"To establish copyright infringement, a plaintiff must prove two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1099 (7th Cir. 2017).

### 1. Plaintiff's U.S. registrations are not entitled to a statutory presumption of validity.

Plaintiff's TRO and PI papers do not meaningfully address the validity of Plaintiff's asserted copyrights at all. That omission matters because the Copyright Act does not automatically give every registration certificate prima facie effect. Under 17 U.S.C. § 410(c), only a certificate "made before or within five years after first publication of the work" constitutes prima facie evidence of the validity of the copyright and of the facts stated in the certificate; where registration is made later, "[t]he evidentiary weight to be accorded the certificate … shall be within the discretion of the court." 17 U.S.C. § 410(c). The Seventh Circuit has expressly recognized that registrations falling within the five-year window receive § 410(c)'s prima facie effect. *Peters v. West*, 692 F.3d 629, 633 (7th Cir. 2012). The point of the statute is obvious and important: the longer the lapse of

time between first publication and registration, the less reliable the facts stated in the certificate are presumed to be. Congress said exactly that in the statutory notes to § 410(c). Thus, when registration occurs outside the five-year period, the Court is not required to presume validity or to accept the certificate's statements at face value.

That is the situation here. Plaintiff's five U.S. registrations identify completion dates in 2007 and first publication dates of October 1, 2017, but the effective registration dates are December 4, 2025 or January 16, 2026—well beyond the five-year period provided by § 410(c). Dkt. 1-1. Accordingly, none of Plaintiff's U.S. registrations is entitled to the statute's prima facie presumption of validity. That point is especially significant because Plaintiff has not offered any meaningful independent validity showing. Plaintiff did not separately prove authorship, ownership, or publication history; did not explain the long delay between first publication and registration; and did not resolve the serious inconsistencies elsewhere in its record concerning who actually authored the asserted works. In these circumstances, the Court should not simply treat the certificates as self-proving. Rather, because § 410(c) leaves their weight to the Court's discretion, the Court should accord them little weight absent independent corroborating evidence of validity, authorship, ownership, and publication history. See 17 U.S.C. § 410(c); *Peters*, 692 F.3d at 633.

At minimum, Plaintiff cannot rely on the certificates alone to carry its burden of showing likely success on ownership and validity at the preliminary-injunction stage.

### 2. Plaintiff failed to show the Chinese Copyrights are valid.

Plaintiff's foreign-copyright showing depends on Exhibit 2 to the Complaint, which purports to provide "Plaintiff's Copyright Registration Certificates in China and Deposited Artworks." Dkt. 1-2. But those materials are not accompanied by any translator declaration, translator certification, or other competent proof identifying who translated them, how they were translated, or whether the English text is accurate and complete. The omission matters. It is a "well-established rule that

a document in a foreign language is generally inadmissible unless accompanied by a certified English translation." *Delta Tech. Dev. LLC v. BIGJOYS*, No. 24 C 2406, 2024 WL 3755929, at *2 (N.D. Ill. Aug. 12, 2024).

The problem is not merely one of translation. Federal law separately provides a specific path for authenticating foreign public records. Under 28 U.S.C. § 1741, a copy of a foreign official record is admissible only when properly certified by the lawful custodian and authenticated in the manner federal law requires. Section 92.39 of Title 22 governs the authentication of foreign public documents (Federal procedures), and provides:

> (a) A copy of a foreign public document intended to be used as evidence within the jurisdiction of the Federal Government of the United States must be authenticated in accordance with the provisions of section 1 of the act of June 25, 1948, as amended (sec. 1, 62 Stat. 948, sec. 92(b), 63 Stat. 103; 28 U.S.C. 1741). This provision of Federal law provides that a copy of any foreign document of record, or on file in a public office of a foreign country or political subdivision thereof, if certified, by the lawful custodian thereof, may be admitted in evidence when authenticated by a certificate of a United States consular officer resident in the foreign country, under the seal of his office.

> (b) The consular officer's certificate should indicate that the copy has been certified by the lawful custodian.

Plaintiff made no attempt to satisfy those requirements. There is no custodian certification from the Guizhou Provincial Copyright Bureau, no U.S. consular authentication, and no declaration establishing chain of custody or reliability of the English text. Even if the Court applies evidentiary rules flexibly at the PI stage, flexibility is not the same as blind acceptance. A plaintiff seeking extraordinary injunctive relief still bears the burden of showing that its ownership evidence is reliable enough to support a finding of validity. Here, Plaintiff's foreign-copyright materials do not meet that standard.

**3. Plaintiff's own authorship theory is facially inconsistent with its registration records, which at minimum destroys any reliable showing of ownership and may implicate § 411(b).**

As set forth in 17 U.S. Code § 411(b)(1) and affirmed by the Seventh Circuit, a registration will not support an infringement action if (a) the registrant included inaccurate information on the application for copyright registration with knowledge that it was inaccurate;" and (b) "the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration." *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 623 (7th Cir. 2013). When inaccurate information is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration. 17 U.S. Code § 411(b)(2).

Plaintiff's ownership theory is internally inconsistent. In the Complaint, Plaintiff alleges that "[t]he authors of the Copyrighted Works include Ms. Yan He and Mr. Jiuzhou Liu" and that, "[b]eginning in 2007, they created a series of 2-D and sculptural artworks featuring bears and other figures." That is a joint-authorship theory: Plaintiff is telling the Court that the relevant body of work was created by two authors.

But Plaintiff's registration evidence does not match that story. The U.S. registration certificates in Exhibit 1 identify Yan He alone as the author and claimant for the registered 2-D works. MPIN MOLI, VEX MOLI, MOON MOLI, and LOVE MOLI each list "Author: Yan He" and "Copyright Claimant: Yan He." Dkt. 1-1, pp. 5-16. By contrast, the Chinese certificates in Exhibit 2 identify Liu Jiuzhou alone as the author and copyright holder for the foreign works. The chart and individual certificates repeatedly list "Author: 刘九洲 (LIU Jiuzhou)" and "Copyright Holder: 刘九洲 (LIU Jiuzhou)"—not both He and Liu together. Dkt. 1-2. Even worse, the Chinese and U.S. copyright registrations for the same work identify different authors.

| Chinese Copyright | Author for the Chinese Copyright | U.S. Copyright | Author for the U.S. Copyright |
|---|---|---|---|
| | LIU Jiuzhou | Birthday Moli | Yan He and Jiuzhou Liu |
| | LIU Jiuzhou | Love Moli | Yan He |
| | LIU Jiuzhou | Moon Moli | Yan He |
| | LIU Jiuzhou | Mpin Moli | Yan He |

|  | LIU Jiuzhou | | Yan He |

Those contradictions matter because copyright ownership initially vests in the author or authors, and "[t]he authors of a joint work are coowners of copyright in the work." 17 U.S.C. § 201(a). A copyright application must identify the "name and nationality or domicile of the author or authors." 17 U.S.C. § 409(2). If Plaintiff now tells this Court that the Copyrighted Works were created by both He and Liu, but its U.S. registrations largely identify He alone while its Chinese registrations repeatedly identify Liu alone, the Court cannot simply assume that the registrations accurately reflect authorship, ownership, or chain of title. At minimum, Plaintiff has not made a clean, reliable showing that it owns valid, enforceable rights in the body of works it seeks to enforce.

These inconsistencies also raise a substantial issue under 17 U.S.C. § 411(b). On this record, Plaintiff has not shown that its asserted copyrights are valid, that the registrations accurately reflect authorship, or that Plaintiff has a coherent chain of title to the full body of works it seeks to enforce. That failure independently defeats any claim that Plaintiff has shown a likelihood of success on the merits.

### 4. Plaintiff also fails to establish likely infringement.

Plaintiff's merits showing is substantially overinclusive. Although Plaintiff obtained relief covering more than forty TikTok product links, Plaintiff did not analyze those listings on a listing-by-listing basis. Plaintiff's TikTok export identifies at least forty accused listings. Dkt. 1-5. Yet Plaintiff submitted comparison materials for only a small subset of products. Dkt. 7-1. That

omission is critical because Plaintiff bore the burden to show likely infringement as to the products it sought to restrain. It was not enough to compare only a few selected products and then ask the Court to assume that dozens of additional listings must also infringe. A preliminary injunction cannot rest on that kind of extrapolation. If Plaintiff wanted more than forty listings removed, it was required to show—listing by listing, or at least with a materially reliable record—that each restrained product was tied to a particular asserted copyright and that each accused product copied protectable expression from that work. Plaintiff did not do so.



Put differently, Plaintiff used a narrow and selective comparison record to obtain a much broader remedy. Rule 65 does not permit a plaintiff to secure sweeping preliminary relief against dozens of products based on a limited set of representative comparisons—particularly where the unrebutted visual record shows that many restrained listings bear no substantial similarity to the asserted works. At minimum, the injunction cannot stand as to those unproven listings.

### D. The balance of hardships weighs in Defendants' favor.

The hardship to Defendants is concrete and immediate. TikTok froze the store accounts, removed non-accused products, and later closed the stores entirely. *See* Zhang Decl. ¶¶11-12. Further, the restraints swept in substantial lawful business unrelated to this case and caused severe disruption to operations, including loss of store access, inability to fulfill orders, inability to receive payouts, interruption of customer relationships, and serious harm to revenue and cash flow. Id., ¶¶16-20.

By contrast, Plaintiff has shown at most the possibility of ordinary commercial harms—lost sales, lost customers, and possible market-share effects. Those alleged harms are economic and traceable. The Seventh Circuit has made clear that courts must weigh the irreparable harm the defendant will suffer from an injunction as well as the plaintiff's claimed harm. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387–88 (7th Cir. 1984). Here, the hardship to Defendants is far more immediate and severe than anything Plaintiff has actually proved.

Accordingly, the balance of hardships weighs in Defendants' favor, and the PI should be dissolved. At minimum, it should be modified to remove the account-wide restraints and restore non-accused products and ordinary store operations.

### E.  The PI Order is grossly overbroad and must at least be modified.

Even if the Court concludes that some interim relief remains appropriate, the present Preliminary Injunction cannot stand in its current form. It is not narrowly tailored to the products Plaintiff actually put at issue. Instead, it imposes account-wide, business-ending restrictions that go far beyond what Rule 65 permits and far beyond what Plaintiff itself now says it intended.

The Supreme Court has long held that injunctive relief must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); accord *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). The Seventh Circuit continues to apply the same rule. Rule 65 likewise requires that every injunction "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). Those requirements are "no mere technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

1. **The PI Order granted Count II related relief that Plaintiff never actually argued in its motions.**

Plaintiff did not actually argue that immediate injunctive relief was warranted on Count II in its TRO motion. To the contrary, Plaintiff expressly told the Court: "Because Defendants No. 4 and No. 5 are mainly involved in Count II related to declaratory of invalidity of certain US copyright registrations … but will not be directly impacted by any TRO, Defendants No. 4 and No. 5 should not be counted" for purposes of the bond calculation. Dkt. 7 at 23. In other words, Plaintiff itself represented that the defendants associated with Count II were not the subject of immediate TRO-based relief.

Yet the PI order later prohibits Defendants from "using Defendants or other entities/individuals to falsely report copyright infringement claims on e-commerce platforms against Plaintiff or its authorized resellers." Dkt. 30 ¶ 1(g). That restraint plainly relates to Plaintiff's Count II theory concerning allegedly false registrations and bad-faith copyright complaints—not simply to the sale of accused products. Thus, Plaintiff did not meaningfully argue for this relief in its motion, did not establish a basis for it, and yet obtained it in the PI order anyway. That alone confirms that the PI is untethered to the motion record and broader than the showing Plaintiff actually made.

The problem is compounded by the fact that the PI order refers generally to "Defendants" rather than clearly identifying which defendants are subject to this Count II-related restriction. *See* Dkt. 30 ¶ 1(g). That is especially problematic because Plaintiff itself previously told the Court that Defendants No. 4 and No. 5 were the ones "mainly involved in Count II." Dkt. 7 at 23. Rule 65 requires an injunction to "state its terms specifically" and "describe in reasonable detail" the acts restrained. Fed. R. Civ. P. 65(d)(1). A PI that grants Count II-related relief without a supporting

merits showing and without clearly identifying which defendants are bound by that relief should not stand. At minimum, this portion of the PI order should be dissolved or stricken.

**2. PI Order effectively authorizes TikTok to shut down entire stores, which has no adequate basis in the record.**

The PI does not merely require removal of specific accused listings. It goes much further. It prohibits a broad range of conduct—including manufacturing, importing, distributing, offering for sale, selling, marketing, advertising, promoting, displaying, shipping, holding, and storing allegedly infringing products—and it separately directs TikTok and other third parties to "disable and cease providing services for any accounts through which Defendants engage in the sale of Infringing Products using the Copyrighted Works." Dkt. 30. That language predictably reaches the entire store account, not merely a limited set of listings. And that is exactly how TikTok appears to have implemented it: by freezing accounts, removing non-accused listings, and ultimately closing stores. A command to "cease providing services for any accounts" is not listing-specific relief. It is account-level relief. In fact, the Store Defendants' TikTok accounts have been closed because of this PI Order. See Zhang Decl. ¶¶12-13. That is especially important because Plaintiff's own counsel has now disclaimed any intent to obtain store-wide closure, writing: "We never intend to delist the store, only the infringing products." *See* Exhibit 2. If that is true, then the current PI is plainly overbroad. Either the order is drafted too broadly, or it is so imprecise that its foreseeable implementation exceeded even Plaintiff's own asserted intent. Under either view, modification is required. At minimum, the order should be revised to make unmistakably clear that any third-party relief is limited to identified accused listings and identified accused promotional content only, not store-wide service disablement.

**3. The PI Order also sweeps too broadly in the conduct it prohibits.**

The PI Order does not limit itself to specific products actually supported by Plaintiff's comparison evidence. Instead, it broadly forbids "infringing" conduct in general and extends to categories such as "holding" and "storing" products. That is extraordinary relief, particularly at the preliminary stage and particularly on an *ex parte* record. The problem is compounded by the mismatch between Plaintiff's proof and the scope of relief obtained. Plaintiff's own TikTok export identified at least forty accused listings, yet Plaintiff submitted comparison evidence for only a small subset of products. It therefore did not prove, on a listing-by-listing basis, that each restrained product infringes any asserted copyright. A preliminary injunction cannot rest on a handful of comparisons and then sweep across dozens of additional products and an entire operating store. Rule 65 does not permit that kind of disconnect between proof and remedy. *Yamasaki*, 442 U.S. at 702; *Madsen*, 512 U.S. at 765. The proper scope of any injunction must be limited to the products and listings actually shown—on the present record—to likely infringe. It should not extend to all supposedly infringing conduct in the abstract, and it certainly should not reach broad categories like "storing" where no separate equitable justification was shown.

**4. The PI Order's financial restraints are independently defective.**

The PI requires third parties to freeze all funds, including pending settlements and future sales, and restrains broad categories of financial activity tied to the accounts. That is a blanket prejudgment freeze. The Supreme Court held in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.* that federal courts generally lack authority to issue a preliminary injunction freezing assets in an action for money damages where the plaintiff claims no equitable interest in the specific assets to be frozen. 527 U.S. 308, 333 (1999). Indeed, "[a] preliminary injunction . . . in aid of the collection of a money judgment, not final equitable relief, [is] an outcome barred by *Grupo Mexicano*." *JSC Foreign Econ. Ass'n. Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,

295 F.Supp.2d 366, 389 (S.D.N.Y.2003). Accordingly, courts may only order prejudgment asset restraints when such relief is not "designed to effectuate the collection of money in satisfaction of alleged legal liability." *Id*. Otherwise, the prejudgment relief amounts to a prejudgment attachment. *See Oak Leaf Outdoors, Inc. v. Double Dragon Int'l, Inc.*, 812 F. Supp. 2d 944, 947 (C.D. Ill. 2011) (citation omitted). Moreover, courts have consistently refused to allow preliminary injunctions when such injunctions essentially "seek[] security for a potential future award of money damages" and are requested merely because of a "feared inability to collect a prospective judgment." *Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp. 2d 962, 971 (W.D. Mich. 2008).

Plaintiff has never made the showing necessary to justify a prejudgment asset freeze. It did not argue—let alone prove—that it would be unable to collect a money judgment at the end of the case, that Defendants were insolvent, that assets were being fraudulently dissipated, or that Plaintiff had any equitable interest in specific, identifiable funds. Instead, Plaintiff relied on broad speculation that funds might be moved and then obtained an order freezing all funds, including pending settlements and future sales. That is not enough. Judge Kness warned that prejudgment asset restraints in Schedule A cases "ought to be the rare exception, not the norm." *Eicher Motors Ltd. v. Partnerships & Unincorporated Associations Identified on Schedule "A"*, 794 F. Supp. 3d 543, 553 (N.D. Ill. 2025). That is especially true here, where the store defendants are registered U.S. companies with publicly disclosed addresses and there is no evidence that Plaintiff could not collect any eventual damages judgment through ordinary post-judgment procedures. On this record, the blanket freeze has no adequate legal or factual basis and should be vacated.

The overbreadth of the freeze is especially clear once the accused listings were removed. According to the declaration, TikTok froze the accounts and removed the accused and non-accused products on or about February 25 and 26, 2026. Once the accused products were disabled, any

funds generated thereafter were not proceeds of those accused listings. Yet the PI still purports to freeze "future sales" without distinguishing between accused-product proceeds and lawful revenue from non-accused products. There is no equitable basis to keep freezing new funds after the accused listings have already been taken down. At minimum, any restraint should have been capped at the amount frozen when TikTok first implemented the order, and any subsequently generated funds should be released.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dissolve the Preliminary Injunction Order in its entirety. In the alternative, Defendants request that the Court substantially modify the Order to limit any relief to specifically identified accused listings, lift the blanket asset freeze, release non-accused funds, and restore ordinary store operations as to non-accused products.

Date: March 23, 2026

/s/ Wei Wang

Wei Wang, Esq.
GLACIER LAW LLP
41 Madison Avenue, Ste. 2529
New York, NY 10010
wei.wang@glacier.law
(212) 729-5073
***Attorney for Defendants***

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 23, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Wei Wang

Wei Wang, Esq.