**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Lishui Mpin Toys Co., Ltd., | § | |
| | § | CASE No: 1:26-cv-945 |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| Sentk LLC, | § | |
| J & Y Stucco LLC, Heyblack International | § | |
| Trade Inc., Shenzhen Yongsheng | § | |
| Technology Co., Ltd., and Qin Lu. | § | |
| | § | |
| *Defendants*. | § | |

## DEFENDANTS' REPLY IN SUPPORT OF THE MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION ORDER

Defendants Sentk LLC, J & Y Stucco LLC, Heyblack International Trade Inc., Shenzhen Yongsheng Technology Co., Ltd., and Qin Lu (collectively, "Defendants"), by and through their undersigned counsel, submit this Reply to Plaintiff's Opposition to Defendants' Motion to Dissolve the Preliminary Injunction Order.

### I. INTRODUCTION

Plaintiff's opposition does not cure the defects identified in Defendants' opening motion. It confirms them. First, the TRO-to-PI path was procedurally defective. Plaintiff never disputes that its *ex parte* TRO papers omitted the written attorney certification required by Rule 65(b)(1)(B). Plaintiff instead says it later filed a declaration and that Defendants have now appeared. But Rule 65's *ex parte* safeguards are front-end requirements, not after-the-fact formalities. And Rule 65(a)(1) required Defendants to have a fair opportunity to oppose the PI before it was entered and enforced—not after TikTok had already frozen the stores.

1

Second, Plaintiff still has not shown irreparable harm. There is no presumption of irreparable harm in a copyright case, and Plaintiff's own new declaration confirms months of delay. Plaintiff says it learned of the alleged infringement in summer 2025, did not obtain product samples until November 2025, and did not sue until late January 2026. That chronology is incompatible with emergency *ex parte* relief.

Third, Plaintiff still has not shown a likelihood of success or a properly tailored injunction. Plaintiff's new 2D/3D authorship theory deepens rather than cures the ownership problem; the foreign-record showing remains deficient; several accused products are not substantially similar to the asserted works; and the PI sweeps far beyond what Plaintiff actually moved for or proved, including DMCA-related relief, store-level consequences, and a blanket asset freeze untethered to any specific equitable res.

The PI should be dissolved. At minimum, it should be substantially narrowed.

## II.   ARGUMENT

### A.  The PI Order Should Be Dissolved Due to Fatal Procedural Defects.

### 1.  The *ex parte* TRO did not comply with Rule 65(b)(1)(B), and Plaintiff's later-filed declaration does not cure that defect.

Plaintiff does not deny the key fact: when Plaintiff asked for *ex parte* TRO relief, it did not submit the written attorney certification required by Rule 65(b)(1)(B). Plaintiff later admitted that omission and filed a declaration nunc pro tunc to "correct" it. That concession should end the issue.

Rule 65(b)(1)(B) provides that a court may issue an *ex parte* TRO *only if* "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(B). The rule is mandatory and not satisfied by a later-filed declaration after the court has already acted without hearing from the other side. The Supreme Court and Seventh Circuit have repeatedly emphasized that *ex parte* TROs are subject to "stringent

restrictions" because *ex parte* judicial action is an extraordinary departure from the ordinary adversarial process. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 438–39 (1974). That is the exact opposite of Plaintiff's position. Plaintiff repeatedly tries to recast the omission as a mere "administrative" problem. It is not. "This certification requirement serves to bolster the specificity requirement; the attorney must put skin in the game and detail the efforts made to give notice or aver why he or she, personally, believes notice should not be required." *Eicher Motors Ltd. v. Partnerships & Unincorporated Associations Identified on Schedule "A"*, 794 F. Supp. 3d 543, 551–52 (N.D. Ill. 2025). A certification filed after the TRO issues cannot perform that function because the court has already acted without hearing from the adverse party.

Plaintiff's response never cites any authority for the proposition it needs most: that a party may omit the Rule 65(b)(1)(B) certification, obtain *ex parte* TRO relief anyway, and then "cure" the omission over a month later by filing a nunc pro tunc declaration. Plaintiff cites no such case because none supports its position. By contrast, courts deny *ex parte* TRO relief where the Rule 65(b)(1)(B) certification is missing. *Eicher Motors Ltd.* 794 F. Supp. 3d at 552–53; *Stoller v. Altisource Residential L.P.*, No. 18-CV-7169, 2019 WL 13328428, at *1 (N.D. Ill. Mar. 14, 2019) ("Here, [plaintiffs] have not adequately certified in writing their efforts to give notice to opposing counsel. This, in itself, warrants denial of their motion under Federal Rule of Civil Procedure 65(b)."); *Dant Clayton Corp. v. Slocum*, No. 4:24-CV-00095, 2024 WL 3730942, at *3 (S.D. Ind. July 16, 2024) (similar); *Oliver v. Lyerla*, No. 3:17-CV-206-DRH-DGW, 2017 WL 3498789, at *1 (S.D. Ill. July 25, 2017) (denying plaintiff's motion for TRO solely based on Rule 65(b)(1)(B)).

The omission also is not harmless here. The defective *ex parte* TRO was the launch point for a one-sided process that led directly to the PI. The PI order itself states that it was entered "in the absence of adversarial presentation," and was issued just five (5) days after the motion

3

requesting the same was filed. Dkt. 30 at 1–2; Dkt. 27-28. Plaintiff therefore cannot argue that the missing certification somehow ceased to matter because the matter later became contested. The ex parte TRO defect infected the whole TRO-to-PI sequence.

Plaintiff's theory would invert Rule 65(b)(1)(B): get the TRO first, supply the required justification later. That is not compliance. The TRO did not comply with Rule 65(b)(1)(B), and the PI that followed that same non-adversarial path should be dissolved.

**2. Defendants did not receive the fair, timely notice Rule 65(a)(1) requires.**

Plaintiff's answer to the notice problem is remarkable. Plaintiff says the issue is now "academic" or "moot" because Defendants have since appeared through counsel and fully briefed the motion. That argument fails under the text of Rule 65 and under binding Supreme Court authority, and is particularly problematic because now Defendants are dealing with in-force injunctive relief, not opposing a motion where Plaintiff bears a heavy burden. Rule 65(a)(1) permits a preliminary injunction only "on notice to the adverse party." The Supreme Court has made clear that the required notice means a hearing in which the defendant receives a "fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose*, 415 U.S. at 433 n.7. And the Court expressly rejected the argument Plaintiff advances here—that what matters is merely that the restrained party later had a chance to move to dissolve the order. The Court held that such a later opportunity "is not the controlling factor," because Rule 65(b) places the burden on the movant to show entitlement to a preliminary injunction; it does not force the restrained party to come forward after the fact and disprove it while dealing with an already in-force order for injunctive relief. *Id*. at 444.

That is also exactly what happened here. Zhang Xiang's declaration states that the Store Defendants did not have actual notice of the lawsuit or PI motion before the restraints took effect; that business@winktoys.com was not the email address registered to the TikTok accounts and was

not regularly monitored for legal matters; and that the Store Defendants first learned of the case only after the stores were frozen on or about February 25–26, 2026. Dkt. 40-3, at ¶¶ 7–12. Plaintiff does not actually refute those facts. Plaintiff merely says that business@winktoys.com appeared on the storefront and was therefore a reasonable place to send notice.

That is not enough. Notice is not automatically adequate merely because a plaintiff transmits papers to some email address. Due process and Rule 65(a)(1) require notice "reasonably calculated, under all the circumstances," to apprise the party of the proceeding and afford an opportunity to respond. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Plaintiff never verified that business@winktoys.com was an actual legal-notice channel for any Defendant. Plaintiff simply assumed that a publicly displayed storefront email was enough. It was not.

Plaintiff's attempt to reframe this as a Hague Convention issue is a non sequitur. Defendants are not arguing that Hague service was required before any provisional relief could issue. Defendants' point is narrower and more fundamental: before entering a preliminary injunction, Rule 65(a)(1) required notice reasonably calculated to provide a fair opportunity to oppose that injunction before it was entered and enforced. Plaintiff's response confuses formal service of process with the separate notice requirement for a PI.

The record also undermines Plaintiff's assertion that email-only notice was all that was reasonably available. Plaintiff's own theory was that the accused stores were "centrally managed and controlled by or closely associated with" Ningbo East Future Imp & Exp Co., Ltd.—a company Plaintiff identifies as its former business partner. Having taken that position, Plaintiff cannot simultaneously insist that this case functioned like an anonymous online-seller matter in which a single unverified storefront email was the only realistic means of notice. If Plaintiff truly believed Ningbo East Future stood behind or controlled the accused conduct, then Plaintiff

necessarily had reason to pursue more reliable channels of notice through that known business relationship rather than rely exclusively on a storefront email it never verified. Yan He Aff. ¶¶ 11.1.22–11.1.27.

The same problem exists for the domestic Store Defendants. Plaintiff previously told the Court that the addresses it located for Sentk, J & Y Stucco, and Heyblack were unreliable, but that assertion rested on Plaintiff's own speculation, not on any failed attempt at service or any actual evidence that the addresses could not be used. Dkt. 23-1 ¶¶ 3–6. And Plaintiff's later filings confirm that, at minimum, J & Y Stucco LLC could in fact be served at the very address Plaintiff had already identified. See Dkt. 38-1. Yet before seeking and enforcing the PI, Plaintiff never attempted to provide notice through those physical addresses. Instead, Plaintiff chose email only— including an address it had no basis to know would actually provide notice. That is not diligence. It is a strategic choice to proceed on the thinnest possible notice and then call the result sufficient after the restraints have already taken effect.

Because Defendants did not receive the fair, timely notice required before the PI issued and before TikTok enforced it, the PI should be dissolved

### B. Plaintiff Failed to Demonstrate Irreparable Harm.

### 1. Plaintiff's delay still defeats any claim of urgency or irreparable harm.

Plaintiff's new declaration does not cure the delay problem. It confirms it. Plaintiff alleged that it first learned of the Winktoys infringement in the summer of 2025, submitted complaints, investigated, placed TikTok orders, received the products in November 2025, and filed suit only at the end of January 2026. Dkt. 45, at 3–4, 13–14; Yan He Aff. ¶¶ 11.1.1–11.1.27. Plaintiff tries to excuse this by citing lack of U.S. litigation knowledge, the absence of an intellectual-property enforcement team, the time required to gather evidence, shipping delays, and difficulty retaining U.S. counsel. Even accepting those explanations in general terms, they do not solve the chronology.

The most important gap remains unexplained: if Plaintiff believed in July 2025 that Defendants were infringing serious, valuable copyrights and causing irreparable injury, why did Plaintiff not promptly purchase sample products then? Plaintiff now relies heavily on the proposition that it needed the physical products to understand the infringement. But that only sharpens the question: why wait until November 2025 to purchase them? Plaintiff's repeated invocation of "investigation" is not an answer. It is a substitute for one.

Delay matters because irreparable harm is fundamentally about urgency. The Seventh Circuit has emphasized that the likelihood of irreparable harm must be evaluated with attention to "how urgent the need for equitable relief really is." *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). Courts in this District routinely treat unexplained delay as powerful evidence that the claimed harm is not truly irreparable or urgent. *See, e.g., Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953–55 (N.D. Ill. 2018); *Ixmation, Inc. v. Switch Bulb Co., Inc.*, No. 14 C 6993, 2014 WL 5420273, at *7–8 (N.D. Ill. Oct. 23, 2014).

Plaintiff's reliance on the later-discovered "NEACOLE" issue does not help. NEACOLE is not a party to this case. And under Plaintiff's own affidavit, the NEACOLE issue was discovered on or about October 12, 2025—months after Plaintiff says it first learned of the core Winktoys infringement. Yan He Aff. ¶¶ 11.2.1–11.2.20. Plaintiff cannot use later information about a non-party brand to erase the earlier delay as to the actual defendants and actual listings here.

Plaintiff's declaration adds narrative detail. It does not add urgency. The delay still substantially undermines, if not defeats, Plaintiff's irreparable-harm showing.

2. **Plaintiff still relies on an impermissible presumption of irreparable harm and still has not shown concrete irreparable injury.**

Plaintiff's opposition expressly states that "[o]nce a protectable interest is established, irreparable injury is presumed," citing old Illinois state-law authorities and federal decisions that

do not support a presumption in this context. Dkt. 45, p. 15. That is not the law here. The Seventh Circuit has made clear that there is no presumption of irreparable harm in copyright infringement case. *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392–93 (2006)); *Park Ridge Sports, Inc. v. Park Ridge Travel Falcons*, No. 20 C 2244, 2020 WL 6262394, at *4 (N.D. Ill. Oct. 23, 2020).

Plaintiff's reliance on *A-Tech* and *McRand* is therefore misplaced. Those are old Illinois Appellate Court decisions. They do not govern the federal equitable standard in a copyright action. And *Nextraq* did not somehow revive a presumption of irreparable harm in federal copyright litigation. Plaintiff is using out-of-context language to bypass *Flava Works*. It cannot.

Even apart from the improper presumption, Plaintiff still has not shown concrete irreparable injury. First, Plaintiff points to alleged false DMCA complaints. But Plaintiff's TRO and PI motion did not actually develop its irreparable-harm theory around that conduct, and—as explained below—it did not properly move for Count II-type injunctive relief in the first place. Plaintiff cannot use a newly expanded narrative in opposition to retrofit irreparable harm for relief it never properly sought. Second, Plaintiff again leans on NEACOLE. But NEACOLE is not a party, and Plaintiff cannot bootstrap irreparable harm in this case by pointing to alleged injuries involving a different brand and then collapsing everything into one broad theory of misconduct. Third, the harms Plaintiff does identify remain overwhelmingly economic and measurable: lost sales, lost distributors, marketplace confusion, and allegedly diverted revenue. Plaintiff's own new affidavit claims that expedited discovery identified more than $3.32 million in revenue on some accused links and only about $26,218 frozen in the accounts. Yan He Aff. ¶ 12.1.7. That is not evidence of irreparable harm. It is evidence that Plaintiff's alleged injury is trackable and quantifiable.

8

The Seventh Circuit has repeatedly emphasized that harm is not irreparable if traditional legal remedies are adequate—that is, if money can compensate it. *DM Trans, LLC v. Scott*, 38 F.4th 608, 618, 621 (7th Cir. 2022); *Sampson v. Murray*, 415 U.S. 61, 90 (1974). And when customers, sales, and revenues can be identified, that cuts strongly against irreparability. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545–46 (7th Cir. 2021).

On this record, Plaintiff's alleged injury is the sort of commercial harm that can be remedied through money and targeted merits relief.

### C. Plaintiff Has Not Shown a Likelihood of Success on the Merits.

### 1. Plaintiff's "2D versus 3D" explanation does not cure the authorship problem.

Plaintiff's principal response is that there is no inconsistency because the U.S. registrations cover 2D works authored by Yan He (sometimes jointly with Liu Jiuzhou), while the Chinese registrations cover 3D works authored by Liu Jiuzhou. Dkt. 45, pp. 12-13. Plaintiff further says that any supposed inconsistency is immaterial because Yan He and Liu Jiuzhou are married and have collaborated professionally for years. *Id*. That argument fails for multiple reasons.

First, changing the format of the work does not by itself change who the author of the underlying design is. Plaintiff's own theory is that the 3D works were created by translating the same 2D designs into three-dimensional toy form. But if the same underlying visual design is being carried over from one format to another, Plaintiff cannot simply relabel authorship by dimensional category and treat that as the end of the inquiry. The issue is not whether 2D and 3D can ever be different works. The issue is whether the authorship information on these registrations accurately identifies who created the expressive design now being asserted against Defendants.

Second, Plaintiff's reliance on the marital and business relationship between Yan He and Liu Jiuzhou is beside the point. Marriage does not alter authorship. Collaboration does not erase authorship. And the absence of an internal dispute between the two of them does not answer

whether the Copyright Office was given accurate information about who authored the asserted works. The legal question is not whether the two authors get along or co-own related companies. The legal question is whether Plaintiff accurately identified the author or authors of the works now being used to obtain and maintain injunctive relief.

Third, Plaintiff's new screenshots do not cure the authorship or originality problem; they make it worse. Plaintiff offers those images as supposed proof that the asserted works were created when and how Plaintiff now claims. But the screenshots themselves show modern file dates inconsistent with Plaintiff's alleged design timeline. For example, Dkt. 46-6 at 4 reflects a file date of December 4, 2025, and Dkt. 46-6 at 8 reflects a file date of January 2, 2026. Likewise, Dkt. 46-7 at 3–4 reflects file dates in December 2024. Those dates are not the historical creation dates Plaintiff alleges for the asserted designs. At minimum, these materials appear to be later-created files, exports, or reconstructions rather than contemporaneous evidence of original authorship at the time Plaintiff claims the works were designed. That mismatch substantially undermines Plaintiff's effort to use these screenshots as reliable proof of authorship, originality, or early creation. On this record, the screenshots do not corroborate Plaintiff's ownership story; they cast further doubt on it.

### 2. Plaintiff's Chinese copyright showing remains deficient because the problem is not just translation; it is also authentication and reliability.

Plaintiff says the translation issue is now a "red herring" because it submitted a translation declaration from a Chinese lawyer. It is not.

The problem is not merely that some English-language document now exists. The problem is that Plaintiff still has not shown that the translations are "certified" in any meaningful evidentiary sense. Plaintiff relies on a declaration from a Chinese lawyer, but Plaintiff has not shown that the declarant is a certified translator, a court-certified translator, or otherwise someone

10

whose translation qualifications have been established in a manner that would make these translations sufficiently reliable for this Court to rely on them as proof of foreign copyright ownership. *See, e.g., ABC Corp. v. Partnerships & Unincorporated Ass'ns Identified on Schedule A*, 2022 WL 18937941, at *1 (N.D. Ill. Dec. 19, 2022) (at TRO stage, plaintiff's Chinese-to-English translations of documents, created using an automatic translation service, were inadmissible under the " 'well-established rule that a document in a foreign language is generally inadmissible unless accompanied by a certified English translation' " where "[t]here [wa]s no indication that anyone with knowledge of the Chinese language reviewed the computer-generated translations created by plaintiff's lawyer"); *Trapaga v. Central States Joint Bd. Local 10,* 2007 WL 1017855, at *8 (N.D. Ill. Mar. 30, 2007) (at summary judgment, striking for improper authentication "English-language versions" of affidavits that "appear to be translation of ... Spanish language versions" of affidavits where "neither contain[ed] any translator's verification or other indication that the testimony was accurately translated"); cf. Fed. R. Evid. 604 ("An interpreter must be qualified and must give an oath or affirmation to make a true translation.").

And even if the translations were adequate, that would not solve the separate authentication problem. Whether framed under 28 U.S.C. § 1741, Federal Rule of Civil Procedure 44(a)(2), or Federal Rule of Evidence 902(3), foreign official records ordinarily require proper authentication. Plaintiff's translation declaration does not authenticate the underlying Chinese official documents. It merely purports to translate them. A translated document is not thereby authenticated as a foreign official record, and a putative foreign official record is not thereby rendered reliable simply because counsel attaches an English translation declaration to it.

**3. Plaintiff still has not shown likely infringement across the full range of accused products.**

11

Plaintiff's assertion that the accused products are "virtually identical" is demonstrably false. Several accused products are plainly not substantially similar to the specific copyrighted works Plaintiff invokes. As the side-by-side figures below show, multiple accused products differ materially in their visual design, including the arrangement of patterns, placement of colors, and overall decorative expression. In a case like this—where the products share a similar underlying toy-bear form and Plaintiff's alleged copyright lies primarily in surface artwork or ornamentation—the analysis cannot be collapsed into the proposition that all decorated "bear" products are the same. Plaintiff had to prove substantial similarity as to the particular protectable expression in each asserted work. It did not.





### D. The PI Order Is Overbroad and Must at Least Be Narrowed.

### 1. The PI granted Count II-related relief that Plaintiff never actually sought or developed in its TRO motion.

Plaintiff's response does not deny the core defect. Plaintiff never argued in its TRO or PI motion papers that it was entitled to immediate injunctive relief based on Count II or based on Defendants' alleged use of copyright complaints. Plaintiff now says only that the relief was "appropriate." But "appropriate" is not the standard. A party seeking extraordinary Rule 65 relief must actually request it in the motion, develop the argument, and support it with law and evidence. It cannot omit the issue from its briefing and then smuggle the relief into a proposed order.

That is exactly what happened here. Plaintiff's TRO memorandum expressly told the Court that Defendants No. 4 and No. 5—whom Plaintiff itself described as mainly involved in Count II—"will not be directly impacted by any TRO." Yet Plaintiff's proposed order and the resulting PI nonetheless included restraints directed at alleged copyright complaints. Plaintiff cannot have it both ways. Judge Kendall has already condemned this exact maneuver. In *Reverse Mortgage Solutions*, the court rejected an effort to obtain relief through a proposed order where that relief

13

was "never discussed at the hearing on the temporary restraining order," calling it "a shameful antic not well received by this Court." *Reverse Mortg. Sols., Inc. v. Reverse Mortg. Sols., Inc.*, No. 15 C 9182, 2015 WL 9478214, at 2 (N.D. Ill. Dec. 29, 2015). The same logic applies here. Rule 65(d) requires specificity, and the Supreme Court has cautioned that injunction requirements are not technicalities to be brushed aside.

Because Plaintiff never actually moved for or developed this Count II-based emergency relief, it should not have been included in the proposed order, and it should not remain in the PI now. That provision should be dissolved or stricken.[1]

### 2. Plaintiff's suggestion that TikTok's store-level enforcement was "independent" is speculation and does not answer the overbreadth problem.

Plaintiff's effort to blame TikTok for the store shutdowns is unsupported. Plaintiff has no declaration from TikTok, no internal platform notice identifying some separate basis for the closures, and no competent evidence showing that TikTok acted for reasons wholly apart from the injunction Plaintiff drafted and obtained. On this record, Plaintiff's claim of "independent" action is speculation. By contrast, Defendants have actually submitted evidence that TikTok shut down the stores because of the PI entered in this case. But even taking Plaintiff at its word that it supposedly "never intended" store-wide shutdowns, that only makes Plaintiff's conduct worse, not better. If Plaintiff truly did not seek that result, then Plaintiff had every reason—and every opportunity—to clarify that point once TikTok froze and closed the stores. Plaintiff did not do so. Plaintiff did not promptly tell TikTok that the order should not be read to authorize full-store shutdowns. As of the filing of this reply, Plaintiff still has not done so. And Plaintiff now resists

---

[1] Incidentally, this sleight of hand also demonstrates the harm in Defendants not being apprised of, or involved in, the TRO and PI processes.

modification that would remove the ambiguity going forward. That is not the conduct of a party acting in good faith to ensure that injunctive relief remains properly tailored.

At minimum, this confirms that the PI is too broad or too ambiguous. Plaintiff therefore should not oppose modifying the PI to make clear that it does not require or authorize shutdown of Defendants' entire stores, removal of non-accused products, or any account-level relief beyond specifically identified accused listings.

### 3. The blanket asset freeze remains independently defective.

Prejudgment asset restraints should be the rare exception, not the routine practice they have become in this District. *Eicher Motors Ltd.*, 794 F. Supp. 3d at 553. Nor does Plaintiff's repeated emphasis on Defendants' foreign status solve the problem. Foreign status, standing alone, does not justify freezing assets at the outset of the case, and Plaintiff offers no evidence that Defendants have transferred assets, are dissipating assets, or are likely to do so. An *ex parte* restraint that strangles defendants at the outset and predictably pressures them into involuntary settlement is far from equitable and is inconsistent with *Grupo Mexicano*. *Id*. That concern is squarely implicated here, where the freeze operated at the beginning of the case and in tandem with other restraints that severely disrupted Defendants' ordinary business operations. And even if some prejudgment restraint could theoretically be justified, an accounting remains a discretionary equitable remedy, not an automatic one. *See Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 736 (7th Cir. 2004). Plaintiff's response confirms the defect: Plaintiff now says the freeze is needed to ensure recovery of "statutory damages" and "actual damages." But a prejudgment asset restraint cannot be justified as preserving supposed equitable relief and then defended as necessary to secure a future legal money judgment. That is precisely what *Grupo Mexicano* forbids.

Thus, the blanket freeze should be dissolved.

### III.  III.CONCLUSION

15

For the reasons above, the Preliminary Injunction should be dissolved.


Date: April 7, 2026                              /s/ Wei Wang

                                                 Wei Wang, Esq.
GLACIER LAW LLP
41 Madison Avenue, Ste. 2529
New York, NY 10010
wei.wang@glacier.law
(212) 729-5073
***Attorney for Defendants***

16

17

## **CERTIFICATE OF SERVICE**

I certify that on April 7, 2026, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing to all counsel of

record.


        /s/ Wei Wang

        Wei Wang, Esq.